Filed 2/22/24  P. v. Johnson CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>ROBERT JOHNSON,<br><br>     Defendant and Appellant. | B324960<br><br>(Los Angeles County<br>Super. Ct. No. TA037534) |

APPEAL from an order of the Superior Court of Los Angeles County, John J. Lonergan, Jr., Judge.  Affirmed.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Nikhil Cooper, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 1998, a jury convicted petitioner Robert Johnson of the murder of Corie Williams and the attempted murder of Tyrone Lewis.  Johnson appeals from the order denying his June 2022 Penal Code[1] section 1172.6 petition for resentencing, formerly numbered section 1170.95.  Johnson argues the record of conviction does not necessarily show either that he was the actual killer or that he acted with malice aforethought.  We disagree and affirm.

## BACKGROUND

1.    *Johnson's Description of the Background Facts[2]*

" 'The 118 East Coast Crips claim the area around Avalon Boulevard and Imperial Highway as their territory.  Bounty Hunter Bloods who attend Centennial High School ride the MTA bus through that territory.  There is a long-standing rivalry between Bloods and Crips gangs in general and between the 118 East Coast Crips and Bounty Hunter Bloods in particular.

---

[1] Undesignated statutory citations are to the Penal Code.

[2] For purposes of this appeal, we accept the "facts" as Johnson recites them in his opening brief.  He relies on the statement of facts in *People v. Pugh* (Mar. 23, 2021, B301904) [nonpub. opn.] (*Pugh*), which in turn relied on the statement of facts in *People v. Johnson et al.* (June 14, 2001, B129670) [nonpub. opn.] (*Johnson*).  By relying exclusively on the factual background in our prior appellate opinion and failing to summarize the evidence before the resentencing court, Johnson has forfeited any objection to inadmissibility of the evidence described in the prior opinion.  (See *People v. Vance* (2023) 94 Cal.App.5th 706, 713.)

The 118 East Coast Crips use certain insults to intimidate Bloods. . . .

" 'In 1996 and 1997, there had been persistent problems between the 118 East Coast Crips and Bloods who rode the number 53 MTA bus that passed by Avalon Boulevard and Imperial Highway. Specifically, Bloods would display gang signs while passing through the Crips' territory. The 118 East Coast Crips considered this disrespectful. . . .

" '[Robert] Johnson [Pugh's confederate] is a member of the 118 East Coast Crips. He is known as "Baby Kiko." Defendant Pugh likewise is a member of this Crips gang. He is known as "Li'l Evil." Defendant Pugh was the leader of the "little ones," or very young gang members such as defendant Johnson.' [*Johnson*, *supra*, B129670.]

"On January 15, 1997[,] Pugh and Johnson 'said it was disrespectful for Bloods to be coming through the neighborhood. They were annoyed at Bloods displaying gang signs and yelling out the bus windows as they passed through the neighborhood. Defendants Pugh and Johnson discussed getting on the bus the next time Bloods were aboard, going to the back, beating up Bloods, then getting off at the next stop. They picked Thursday, January 16, as a good day for the attack. . . .' (*Johnson*, *supra*, B129670.)

"On January 16, 1997, Pugh said, ' "Y'all ready?" ' and boarded the bus with Johnson and Randall Amado. (*Johnson*, *supra*, B129670.) Amado had a handgun. (*Ibid*.) Pugh 'led the group across the street' to the bus. (*Ibid*.) Pugh boarded the bus and he and his confederates 'identified themselves as 118 East Coast Crips, then demeaned Bloods with epithets. At least one of them shouted, "Shoot this . . . bus up[.]" ' (*Ibid*.)

"*Johnson used a pistol to shoot two victims, one of whom died as a result of a gunshot wound to the neck.*  (*Johnson*, *supra*, B129670.)  After the shooting, the 'Crips ran' away and were heard 'laughing about the shooting.  They said they heard they had shot a girl.'  (*Ibid.*)"  (*Pugh*, *supra*, B301904, italics added.)

"In a pretrial interview, Johnson told police that he, Pugh, and others gathered.  (*Johnson*, *supra*, B129670.)  ' "Everyone was talking about getting the Bloods who ride the bus."  The plan was to drag some Bloods off of the bus, after which they would "torture them and kill them."  He [Johnson] started to get on the bus but another gang member pulled him off.  Defendant Johnson walked to the rear of the bus.  He pointed a .40 caliber Glock at the rear window.  Everyone was yelling at him to shoot.  He put the gun into the rear window next to the rear door, then fired four times. . . .  He was shooting at two Bloods at the rear of the bus.'  (*Ibid.*)

"In a pretrial written statement, Pugh stated that he 'was waiting at the bus stop at Imperial Highway and Avalon Boulevard with his girlfriend, Natasha Barnes (Barnes).  He intended to take Barnes to his grandmother's house . . . .  Defendant Pugh identified himself as an East Coast Crip.  He was dressed in blue as he waited at the bus stop.  There just happened to be eight East Coast Crips at the bus stop that day.  When the bus stopped, a woman got on, followed by Barnes and defendant Pugh.  As he was about to pay his fare, defendant Johnson went to the back of the bus, where approximately 10 Bounty Hunter Bloods were seated.  After an exchange of words, defendant Johnson got off the bus.'  (*Johnson*, *supra*, B129670.)  Pugh 'saw a hand holding a gun come through the back of the bus as the door closed and the bus began to pull away

4

from the bus stop . . . . He heard approximately 12 shots.' (*Ibid.*)" (*Pugh, supra*, B301904).)

## 2. *Procedural Background*

Johnson was tried in a joint trial with Pugh and Amado, with one jury for Johnson and the other for Pugh and Amado. Only Johnson's jury heard Johnson's pretrial admission that he was the shooter. The court instructed the juries together. Johnson's counsel's argued that although "Mr. Johnson acknowledged his guilt for the crimes," Amado "was the killer in this case." Johnson's counsel further argued, "[W]e know that Mr. Johnson was not the shooter. And we know that it's probable that Mr. Amado is the shooter."

### a. *Instructions*

The instruction on natural and probable consequences identified the target crime of assault with a firearm and potentially permitted an aider and abettor in an assault with a firearm to be convicted of murder.[3] The natural and probable

---

[3] The natural and probable consequence instruction provided: "One who aids and abets [another] in the commission of a crime [or crimes] is not only guilty of [those crimes], but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted.

"In order to find a defendant guilty of the crime[s] of murder, assault with a firearm & shooting into an occupied vehicle . . . you must be satisfied beyond a reasonable doubt that:

"1. The crime of assault or assault with firearm was committed;

5

consequence instruction did not include attempted murder. A conspiracy instruction incorporated natural and probable consequence doctrine, but applied that doctrine only to assault with a firearm and shooting at an occupied vehicle, not murder or attempted murder.

The court instructed the juries on deliberate and premeditated murder and that instruction required "express malice aforethought." The final portion of the instruction provided: "To constitute a deliberate and premediated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, [he] decides to and does kill."

With respect to murder, the court instructed the juries on transferred intent: "[O]ne attempts to kill a certain person, but

---

"2.    That the defendant aided and abetted that crime;

"3.    That a co-principal in that crime committed the crime[s] of murder and assault with a firearm; and

"4.    The crime[s] of murder and assault with a firearm [were] a natural and probable consequence of the commission of the crime[s] of assault or assault with a firearm.

"[You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crimes of murder and assault with a firearm & shooting into an occupied vehicle was a natural and probable consequence of the commission of that target crime.]"

6

by mistake or inadvertence kills a different person, the crime, if any, so committed is the same as though the person originally intended to be killed, had been killed."

The court also instructed the juries on aiding and abetting as follows: "A person aids and abets the [commission] [or] [attempted commission] of a crime when he or she, [¶] (1) with knowledge of the unlawful purpose of the perpetrator and [¶] (2) with the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) by act or advice aids, promotes, encourages or instigates the commission of the crime."

The court instructed the juries that to convict for attempted murder, it had to find that the defendant harbored "express malice aforethought, namely, a specific intent to kill unlawfully another human being." The court further instructed on the definition of willful, deliberate, and premeditated attempted murder: "To constitute willful, deliberate, and premeditated attempted murder, the would-be slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decides to kill and makes a direct but ineffectual act to kill another human being. [¶] The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true."

Although the court instructed the juries on second degree felony murder, neither jury found Johnson or his confederates guilty of second degree murder.

As to the firearm allegation, the trial court instructed the juries that it was alleged Johnson personally used and personally discharged a firearm at an occupied motor vehicle in the

7

commission of the murder and attempted murder.  The court further instructed the jury that if it found Johnson guilty of one or more charged crimes it had to determine whether he personally used and personally discharged a firearm at an occupied vehicle in the commission of the crimes.

**b.**	*Verdict*

We focus on those aspects of the verdict relevant to Johnson's resentencing petition.

The Johnson jury convicted him of the first degree murder of Corie Williams.  The jury further found a principal was armed with a handgun and Johnson personally used a handgun.  The jury found that, in the commission of the murder, Johnson discharged a firearm at an occupied motor vehicle.  The jury also convicted Johnson of the attempted murder of Tyrone Lewis and found that the attempted murder was committed willfully, deliberately, and with premeditation.  The jury further found that a principal was armed with a handgun and Johnson personally used a handgun in the commission of the attempted murder.  In addition, the jury found Johnson discharged a firearm at an occupied vehicle.[4]

For the murder, the trial court sentenced Johnson to an indeterminate 25-year-to-life term and a determinate six-year term for one of the firearm enhancements.  For the attempted murder, the court sentenced Johnson to a concurrent sentence of

---

[4] The jury also convicted Johnson of assault with a firearm on Tammy Freeman, another passenger on the bus with Williams and Lewis, and found Johnson personally used a firearm, personally discharged a firearm at an occupied vehicle, and personally inflicted great bodily injury on Freeman.  Finally, the jury convicted Johnson of shooting at an occupied vehicle.

life with the possibility of parole. The court sentenced Johnson to an additional four year determinate term for the assault with a firearm and shooting at an inhabited dwelling. The court stayed the sentence on the firearm enhancements for each offense other than the six-year term for the murder.

On June 20, 2022, Johnson petitioned for resentencing. The court appointed counsel and counsel argued Johnson "met his burden of establishing a prima facie showing that he is entitled to relief." After a hearing, the court denied the petition, finding Johnson ineligible for resentencing as a matter of law. The court stated that "it was the petitioner Mr. Johnson that took a handgun and fired it into the rear window of the bus . . . ."

## DISCUSSION

Johnson argues the resentencing court erred in finding that he was ineligible for resentencing because the record neither shows as a matter of law that he was the actual killer nor that he acted with malice aforethought.

### A. Legal Resentencing Principles

Prior to 2019, a jury could convict a defendant of murder under the felony-murder rule and natural and probable consequences doctrine without finding malice. Under the felony-murder rule as it existed before 2019, malice was imputed if the defendant intended to commit the underlying qualifying felony. (*People v. Chun* (2009) 45 Cal.4th 1172, 1184 [" 'The felony-murder rule imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life.' "].) Under the natural and probable consequences doctrine, as it existed before 2019, an aider and abettor could be held liable for any offense

9

that was the natural and probable consequence of the crime aided and abetted. (*People v. Chiu* (2014) 59 Cal.4th 155, 158 [describing former law].)

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Stats. 2018, ch. 1015, §§ 2–4) modified the law relating to accomplice liability for murder, eliminating the natural and probable consequences doctrine as a murder theory (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843) and more narrowly defining felony murder. (*People v. Strong* (2022) 13 Cal.5th 698, 703 (*Strong*); §§ 188, subd. (a)(3), 189, subd. (e)(3)). Senate Bill No. 1437 also added former section 1170.95 providing the procedure for a defendant convicted of felony murder or murder based on the natural and probable consequences doctrine to request resentencing relief. (*Gentile*, at p. 843.)

Effective January 1, 2022, Senate Bill No. 775 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 551, § 2) amended section 1170.95. In addition to convictions based on the natural consequences and felony murder doctrines, persons convicted on a "theory under which malice is imputed to a person based solely on that person's participation in a crime" are eligible for resentencing relief. (§ 1172.6, subd. (a); see also former § 1170.95, subd. (a).) The bill clarified that persons convicted of attempted murder or manslaughter also may petition for resentencing. (*People v. Whitson* (2022) 79 Cal.App.5th 22, 30.) It further clarified that the burden of proof applicable in the evidentiary hearing is beyond a reasonable doubt. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1020–1021.) The Legislature then renumbered former section 1170.95 to section 1172.6 without

10

substantive change.  (*Strong, supra,* 13 Cal.5th at p. 708, fn. 2, citing Stats. 2022, ch. 58, § 10.)

Section 1172.6 describes a multipart process for resentencing petitions.  The first step is making a prima facie case for relief.  "When the trial court receives a petition containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' [Citation.]  If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition."  (*Strong, supra,* 13 Cal.5th at p. 708.)  When evaluating a petition, the resentencing court may consider the record of conviction.  (*People v. Lewis* (2021) 11 Cal.5th 952, 972.)  " '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.'  [Citation.]  'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' [Citation.]"  (*Lewis,* at p. 971.)

In *People v. Curiel* (2023) 15 Cal.5th 433, our Supreme Court held that "a petitioner who alleges that he or she could not currently be convicted of a homicide offense 'because of changes to Section 188 or 189 made effective January 1, 2019' (§ 1172.6, subd. (a)(3)) puts at issue all elements of the offense under a valid theory."  (*Curiel,* at p. 462.)  The allegation "is not refuted by the record unless the record conclusively establishes every element of the offense.  If only *one* element of the offense is established by the record, the petitioner could still be correct that he or she

11

could not currently be convicted of the relevant offense based on the absence of *other* elements." (*Id.* at p. 463.)[5]

## B.   Johnson Is Ineligible for Resentencing

On appeal, Johnson's principal argument is that "nothing in appellant's record of conviction shows as a matter of law that appellant was the actual killer." Johnson's argument contradicts *his* statement of facts on appeal, which includes his admission that he "used a pistol to shoot two victims, one of whom died as a result of a gunshot wound to the neck." (*Artal v. Allen* (2003) 111 Cal.App.4th 273, 275, fn. 2 [noting that a statement in a brief may be deemed an admission of fact or law against the party making it].)

Johnson's argument is also inconsistent with the record of conviction, which demonstrates Johnson was the only person who discharged a firearm during the commission of the murder and attempted murder. Reaffirming this conclusion is the Johnson jury's finding that he discharged a firearm at an occupied vehicle, the only such vehicle being the bus in which the victims were riding. Put simply, Johnson's jury necessarily rejected the argument of Johnson's trial counsel that Amado, rather than Johnson, was the shooter. In his reply brief on appeal, Johnson asserts, "[T]he jury could . . . have decided that an accomplice may have shot and killed the murder victim . . . ." There are

---

[5] We asked the parties for supplemental briefs to address what impact, if any, *Curiel* has on the issues in this appeal. Johnson responded that *Curiel* shows "discerning care must be taken . . . in assessing whether any of the jury's verdicts or findings show as a matter of law that appellant was the actual killer . . . ."

two problems with this argument.  First, it is bereft of citation to the record.  Second, Johnson's contention conflicts with his admission in his statement of facts and his jury's findings that he was the person who discharged a firearm during both the murder and attempted murder.

Johnson next argues that standing alone, the firearm enhancement does not show malice aforethought.  We agree with that statement as a general principle.  (*People v. Offley* (2020) 48 Cal.App.5th 588, 598.)  In this case, however, additional information in the record of conviction shows the jury "must have convicted the defendant on the basis of his own malice aforethought."  (*Id*. at p. 599.)

Given the trial court's instructions on attempted murder and willful, deliberate, and premediated attempted murder, the jury could not have found him guilty of attempted murder without also finding he intended to kill.  To reiterate, the trial court instructed the jury that a necessary element of attempted murder is that "[t]he person committing the act harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being."  (See p. 7, *ante*.)  Also, in accordance with the trial court's instructions, by finding the attempted murder willful, deliberate, and premediated, the jury reaffirmed that Johnson weighed the killing and decided to kill another human being.  (See *ibid*.)

With respect to the murder, the jury necessarily found Johnson harbored intent to kill when it convicted him of first degree murder rather than second degree murder.  The first degree murder instruction included that "[t]o constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against

13

such a choice and, having in mind the consequences, [he] decides to and does kill."[6]  His conviction of first degree murder belies his counsel's argument that the record of conviction fails to demonstrate he harbored malice aforethought.

Johnson acknowledges on appeal, that if he "was the sole shooter, acting with express malice, as the prosecution asserted in closing argument, then he would of course be ineligible for relief."  (See *People v. Garrison* (2021) 73 Cal.App.5th 735, 743–744 [actual killer ineligible for resentencing].)  The finding in a joint trial that Johnson was the only person who discharged a firearm in connection with the murder and attempted murder shows he was the actual killer.  Further it shows Johnson's jury necessarily rejected Johnson's alternate theory that Amado was the shooter.  The instructions combined with the verdict demonstrate as a matter of law, that Johnson acted with express malice, i.e. intent to kill when he premeditated the murder and the attempted murder.  As a matter of law, Johnson is thus ineligible for resentencing.

---

[6]  See page 6, *ante*.

## DISPOSITION

The order denying Robert Johnson's resentencing petition is affirmed.

<u>NOT TO BE PUBLISHED.</u>

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.